IN THE MATTER OF THE SUPERVISION AND ASSIGNMENT OF THE PETIT JURY PANELS IN ESSEX COUNTY, NEW JERSEY.

Superior Court of New Jersey
Law Division

Decided May 12, 1971.

*Mr. Francis Patrick McQuade,* Essex County Counsel, appeared for Sheriff John F. Cryan.

*Mr. Dickinson R. Debevoise* appeared for the Essex County Bar Association, *amicus curiae* (*Messrs. Samuel S. Saiber* and *Joseph F. Walsh,* of counsel; *Mr. Daniel Eric Knee,* on the brief).

GIULIANO, A. J. S. C. This is an administrative proceeding initiated by order of the court directing John F. Cryan, Sheriff of Essex County, to show cause why he should not be permanently enjoined from interfering with the exercise by the Court of its duties and responsibilities to supervise petit jurors and petit jury panels and to assign petit jury panels for trials to the Superior Court, the Essex County Court and the Essex County District Court. On the return day of the order leave was granted to the Essex County Bar Association, upon its application made on proper notice, to submit its brief and be heard in the matter *amicus curiae.*

The circumstances which impelled the issuance of the Order are set forth in the exhibits annexed thereto. By its Order of February 3, 1971 the court, pursuant to *R.* 1:33–3(b), appointed and designated William Williams, Senior Court Clerk, as Assistant Assignment Clerk-Civil, "to assist the Assignment Judge of Essex County in summoning and supervising the daily attendance of the petit jurors and the assigning of petit jurors required for trials by the Superior Court, the Essex County Court and the Essex County District Court, effective March 1, 1971." By letter of April 2, 1971 the sheriff asserted that effective April 5, 1971 he was assigning William K. McTague as Jury Control Supervisor. By letter of April 5, 1971 the court responded, informing the sheriff, among other things, that "the matter of supervision of the jury system in this County rests exclusively with" the assignment judge, exercised by him directly or through personnel assigned by him for that purpose; and that the court "cannot and will not permit interference by

anyone with the jury system in this County." By an office memorandum of April 19, 1971 the sheriff directed that "Effective immediately Frank Nigro will be in charge of JURY CONTROL."

The sheriff contends that he has certain "powers and duties with respect to petit jurors and jury panels as are mandated by law to his office as an elected constitutional officer of the State." Any suggestion that the mere mentioning of the office of sheriff in the State Constitution precludes the Legislature from altering the duties of sheriffs was firmly laid to rest 60 years ago by the former Court of Errors and Appeals in *State v. De Lorenzo*, 81 *N. J. L.* 613 (1911). One of the contentions made in that case was that since the Constitution[1] provided that "sheriffs * * * shall be elected by the people of their respective counties," the implication was "that the attributes and faculties of the office of sheriff as they existed at the time of the adoption of the constitution are, by this mention of the office in the constitution, crystalized and rendered immune from alteration or subtraction by the legislature." At the time, this contention had support in a decision of the former Supreme Court in the case of *Virtue v. Freeholders of Essex*, 67 *N. J. L.* 139 (Sup. Ct. 1901). In firmly rejecting that contention and in disapproving the decision in *Virtue*, the court in *De Lorenzo*, unanimously held that the duties of sheriffs are "always subject to legislative change" (81 *N. J. L.* at 622).

Legislative reform to eliminate political influence and control over the jury system was strongly urged by Governor Woodrow Wilson in his Second Annual Message to the Legislature on January 14, 1913.[2] Although a number of leg-

[1] *N. J. Const.* (1844), Art. VII, § II, par. 6, now *N. J. Const.* (1947), Art. VII, § II, par. 2.

[2] "There is another matter that cries out for reform and has long cried out for it. Why has no Legislature ever seriously and earnestly set itself to correct it? The drawing of grand juries, and even upon occasion the drawing of petit juries, is notoriously subject to political influence and control in this State, of whose processes of justice we are so proud and whose honor we are in most cases so

islative modifications in the approach to the jury system followed, it was not until the enactment of *L.* 953, *c.* 240, that the full administration of the jury system was vested in the court.

The situation as it existed following the adoption of *L.* 1929, *c.* 17, is referred to in the opinion of the former Court of Errors and Appeals in *State v. Profita,* 114 *N. J. L.* 334, 340 (1935), as follows:

> By chapter 20 of the Special Session of 1913 (*Pamph. L.* 1913, *p.* 828), the legislature took from the sheriff, by revision of the subject-matter, the right to act alone in selecting juries and provided that a citizen should be appointed by the chancellor to be designated a commissioner of juries and that he and the sheriff should constitute "the commissioners of juries." The two-man commission still endures, the appointing of the citizen commissioner having been transferred by amendment (*Pamph. L.* 1929, *ch.* 17), from the chancellor to the governor acting with the advice and consent of the senate. * * *

By *L.* 1934, *c.* 111, the appointing of the "citizen commissioner" was vested in the Supreme Court Justice presiding in the county. Further modification occurred in 1944. By *L.* 1944, *c.* 96 the Legislature vested in the Governor, by and with the advice and consent of the Senate, the power to appoint in each county "two citizens, resident therein who shall not be members of the same political party, who shall constitute and be designated as 'commissioners of juries,' hereinafter designated jury commissioners, of the county."

In 1953 the appointing of the two citizen commissioners was transferred by amendment (*L.* 1953, *c.* 240, § 1; *N. J. S. A.* 2A:68–1) from the Governor to the Supreme Court.

---

quick to defend against question or slander. This can and should be remedied. You cannot neglect it without seeming indifferent to justice and fair play in matters which are matters of life and death and reputation and honor and which cut to the very quick of human rights. The free, prompt, unbiased administration of criminal justice has been time out of mind at the very center of the fight for individual right and liberty. It is to be hoped that the commission now investigating the various methods of governing this all-important matter will presently submit a thorough and conclusive report."

The clear intent of the Legislature in enacting this legislation is set forth in the Statement appended to Assembly Bill 2 of 1953 which became *L.* 1953, *c.* 240. That Statement reads as follows:

In his Annual Message to the Legislature on January 13, 1953, Governor Driscoll again urged that "the authority to appoint jury commissioners be transferred to the Supreme Court where it naturally belongs." He pointed out that: "The jury system is an integral and very important part of our judicial system, and it should be administered as part of the general administration of justice. Such a step could, moreover, develop into a useful contribution to improved law enforcement."

This bill would implement the above recommendation of the Governor.

See also, Editorial, 73 *N. J. L. J.* 20 (January 19, 1950), entitled "A Proposed Improvement in the Jury System." A copy is appended to this opinion.

That jurors should be selected by commissioners appointed by the courts was one of the recommendations adopted by the American Bar Association in July 1938. The essential character of this recommendation is stressed in *Minimum Standards of Judicial Administration* (National Conference of Judicial Councils, 1949) edited by former Chief Justice Arthur T. Vanderbilt, as follows:

The efficacy of jury trials depends as much on the caliber of the jurors as on the character and training of the trial judges and the powers accorded them in the conduct of jury trials. The caliber of the juries in turn hinges on the mode of selecting them. In selecting jurors, the elimination of political influence is a paramount consideration. This can never be accomplished when the jury commissioners are politically elected or appointed officials. Therefore, the recommendation for the appointment of jury commissioners by the courts is a fundamental one. [at 147]

Pursuant to its constitutional grant of authority to pass general laws for "selecting, drawing, summoning or empaneling grand or petit jurors" (*N. J. Const.* (1947), Art. IV, § VII, par. 9), the Legislature has, in addition to its enactment of *L.* 1953, *c.* 240, provided a comprehensive series

of statutes relating to jurors and jury panels. *N. J. S. A.* 2A *chapters* 68 through 79. In doing so, it has vested exclusively in the assignment judge for the county the ordering, selection, processing, and assignment for trials of petit jury panels in the county. The assignment judge must determine the number of persons on the petit jury list, *N. J. S. A.* 2A:70–1; he is required to check closely the petit jury list prepared by the jury commissioners and may, in his discretion, strike therefrom the name of any person, *N. J. S. A.* 2A:70–2; he or a judge designated by him is required to supervise the drawing of petit jury panels, *N. J. S. A.* 2A:71–2; he may, in his discretion, "divide the general panel of petit jurors summoned for the trial of causes in the county into 2 or more separate panels and designate the court and place in which each separate panel shall serve and the period of service," *N. J. S. A.* 2A:71–8; and he may direct that the panel of petit jurors drawn "shall serve only during a designated part of the next ensuing stated session of the court," *N. J. S. A.* 2A:71–9.

Similarly, *R.* 1:33–3(a) imposes upon the assignment judge, subject to the direction of the Chief Justice or rule of the Supreme Court, the responsibility "for the administration of civil and criminal justice and for the administration of all courts in the county for which he is the Assignment Judge," with duties including:

(1) The supervision of all trial judges sitting in the county and of all court clerks and other officers and employees of or serving the trial courts in the county.

(2) The supervision of the jury commissioners, the selection of all grand and petit jurors, and the organization and operation of the grand jury in the county.

(3) The supervision and expeditious movement of the civil and criminal trial calendars of the Superior and county courts and, through the judge or presiding judge thereof, of the juvenile and domestic relations court, the county district court and the municipal courts in the county.

And by *R.* 1:34–3 jury commissioners are "responsible to and under the supervision of the assignment judge of the county."

None of the statutes relating to juries places in the sheriff even the slightest scintilla of authority to supervise or direct petit jurors or petit jury panels returned to the court for jury service in the county. Any ministerial functions which he performs for the court are under the supervision and direction of the court.

In *State v. Sturdivant*, 31 *N. J.* 165, 171 (1959), *cert.* den. 362 *U. S.* 956, 80 *S. Ct.* 873, 4 *L. Ed.* 2d 873 (1960), Chief Justice Weintraub, writing for the court, points out:

> It was the ancient function of the sheriff to select and summon jurors in response to the writ of *venire facias*. His discretion was described as "uncontrolled." 1 *Thompson, Trials* (1889), § 13, *p.* 12. The process was attended by abuses, chiefly the packing of juries. To guard against that evil, the English courts were authorized by statute to reform the panel by taking out names and inserting others. *State v. McCarthy*, 76 *N. J. L.* 295, 300 (*Sup. Ct.* 1908). To the same end, statutes today generally provide for the preparation of lists of jurors in advance of the court sessions, from which lists panels are chosen, by lot, and from which panels jurors are chosen again by lot for service in individual cases. Such, of course, is the overall plan of our statute, with jury commissioners rather than the sheriff being charged with the duty to select qualified persons for inclusion in the basic jury lists. *N. J. S.* 2A:70–1.

See also, *State v. Pacheco*, 38 *N. J.* 120, 130 (1962).

Former Chief Justice Vanderbilt, in his articles entitled "Improving the Administration of Justice — Two Decades of Development" (College of Law, University of Cincinnati, 1957),[3] points out in regard to the functions of the assignment judge:

> So that you may have a clearer idea of the function of the Assignment Judge and his importance in our administrative organization, I should like to take the time to mention specifically some of his responsibilities. He is directly responsible for the management of the civil and criminal calendars in both the Superior and County Courts and for the assignment of cases for trial. He is directly responsible for the selection of jurors in his county and for the organization and instruction of the grand jury. He generally reserves for himself those civil and criminal cases which for one reason or another are of

[3]Also published in 26 *Cincinnati L. Rev.* 155 (1957).

'extraordinary public importance. He must work with the governing body of the county to see that adequate appropriations are made for the courts financed by the county. He must generally supervise the work of the county clerk and the work of the Juvenile and Domestic Relations Court, the County District Court and the several municipal courts in his county. In short there is virtually nothing affecting the administration of civil and criminal justice in his county with which he is not concerned. In many ways the Assignment Judges are the most important part of our court administrative machinery; for without them the entire system would break down. [at 79]

In light of all of the foregoing, it is evident that any attempt by the sheriff to interfere with the court's functions in the supervision, processing, selection, or assignment of petit jurors or petit jury panels is inimical to the sound administration of civil and criminal justice in the county and in direct violation of the applicable rules, statutes and decisional law of the State. In *Lichter v. Monmouth County*, 114 *N. J. Super*. 343, decided April 13, 1971, the Appellate Division stressed:

The intent of the 1947 Constitutional Convention was to vest the Supreme Court with the broadest possible administrative authority. Conceptually, such authority encompasses all facets of the internal management of our courts. *Cf.* [*In re*] *Mattera, supra* [34 *N. J.* 259] at 272. This was made clear by the committee on the judiciary which considered it a fundamental requirement that the courts be vested with "exclusive authority over administration." 2 *Constitutional Convention*, 1947, at 1180, 1183.

The attempt by the sheriff to impinge upon the exclusive authority of the court over the administration of the jury system, disclosed in the exhibits annexed to the order to show cause, cannot be countenanced.

Accordingly, a permanent injunction will issue enjoining and restraining John F. Cryan, Sheriff of Essex County, from in any way interfering with or attempting to interfere with the exercise by the court, and the assignment judge thereof for Essex County, of their duties and responsibilities to supervise, process and select petit jurors and

petit jury panels and assign petit jury panels for trials to the Superior Court, the Essex County Court and the Essex County District Court.

## APPENDIX

## A PROPOSED IMPROVEMENT IN THE JURY SYSTEM*

The program of court reform which was inaugurated by the Constitution of 1947 has been primarily concerned with the roles played by the judge and the lawyer in the trial of an action. It is important that the role of a third participant, the jury, be not overlooked. We all recognize the fact, very likely as a result of bitter experience, that in the average trial at law, despite the excellence of the performance of a lawyer or even the judge, the ultimate decision of whether justice or injustice shall be meted out to the litigants lies within the control of the jury. In the development of an entire system of administering justice, the importance of efficiency and high principles in the administration of the jury system cannot be overestimated.

At the present time our jury panels are selected by two jury commissioners in each county, who are appointed by the Governor by and with the consent of the Senate. The statute, R. S. 2:87–1, provides that the commissioners shall not be members of the same political party, shall not hold any public office other than that of sheriff, and shall not be licensed to practice law in this State.

A bill, S-92, was introduced into the Senate last year to amend the statute to provide for the appointment of commissioners of juries by the Supreme Court rather than by the Governor. The bill carries out a recommendation adopted by the American Bar Association in 1938. The statement to the bill indicated that the proposed amendment met with the approval of the Governor, but the bill was never reported

---

*Editorial, New Jersey Law Journal, January 19, 1950 (73 N. J. L. J. Index Page 20)

out of committee. We believe this bill should receive favorable action for two principal reasons.

First, as heretofore noted, the jury system is not an independent system; it performs a function, in the same way as lawyers and judges perform their functions, in an integrated process for the administration of justice. It is the intent and spirit of our new judicial system that the administration of the entire integrated process shall be centered in the Supreme Court. The proposed bill carries out that intent.

Secondly, the importance of the function of a jury commissioner in the judicial system is so great that he should be removed, as far as humanly possible, from the pressures and influences to which a person holding political office is often subjected. The jury system is one of the basic pillars of a free society. Its administration must be kept at all times at the highest possible level, and must never be permitted to become suspect in the eyes of the public. The proposed bill would help to insure the continued strength and integrity of our system.